35 C.C.P.A.(Patents)

## GIAMBALVO v. DETRICK et al.
### Patent Appeal No. 5426.

Court of Customs and Patent Appeals.

May 4, 1948.

Byerly, Townsend & Watson, of New York City (Ralph M. Watson, of New York City, of counsel), for appellant.

Cullen G. Frey, of Wilmington, Del. (C. H. Biesterfeld, of Washington, D. C., of counsel), for appellees.

Before GARRETT, Presiding Judge, and HATFIELD and JACKSON, Associate Judges.

GARRETT, Presiding Judge.

This is an appeal from the decision of the Board of Interference Examiners of the United States Patent Office awarding priority to appellees in an interference proceeding involving two counts which read as follows:

"1. In a process for preparing phthalocyanine pigments in an extremely finely divided form, the step which comprises drowning an acid solution of the phthalocyanine color in water which is in a state of turbulent flow and in which no laminar flow exists.

"2. A copper phthalocyanine pigment which has been precipitated by the process of count 1 which when ground in a paint vehicle is very dark or jet in mass tone, redder, brighter and stronger than the same color when precipitated from acid solution by conventional drowning methods."

■ The joint application of Detrick et al., Serial No. 320,418, was filed February 23, 1940, and matured into patent No. 2,334,812, dated November 23, 1943. The application of Giambalvo, Serial No. 342,-114, was filed June 24, 1940, and, therefore, was copending with that of Detrick et al. for about fifteen months and at the time the patent was issued to the latter. So, while the interference was declared between the patent and the application of Giambalvo, the latter had the burden of establishing priority by a preponderance of the evidence only, so far as the matter depends upon evidence.

The counts originated with Detrick et al. and were copied into the application of Giambalvo February 25, 1944, about three months after the patent was issued, with a request for an interference. This was duly declared March 27, 1944. Preliminary statements were duly filed by the respective parties which, when opened, disclosed that Giambalvo claimed conception and reduction to practice as early as January 13, 1939, while the earliest date claimed by Detrick et al. for any inventive element was during April 1939, reduction to practice being alleged during July 1939.

During the motion period, specifically on June 2, 1944, Detrick et al. moved to dissolve the interference, alleging:

"1. The party Giambalvo does not have the right to make the counts of this interference because these counts define an invention that is neither disclosed nor suggested in his application Serial No. 342,-114; and

"2. The counts of this interference are not patentable to the party Giambalvo, the counts being limited to a process and a product neither of which have been [sic] described in his application Serial No. 342,114 and therefore cannot be made as claims in that application."

The Primary Examiner denied the motion to dissolve in a decision rendered September 25, 1944, and adhered thereto in a second decision rendered October 27, 1944, upon a request for reconsideration.

Detrick et al. thereafter gave notice, in conformity with the provisions of Patent Office rule 154(e), 35 U.S.C.A.Appendix, that nonpatentability of the counts to Giambalvo again would be urged "as a basis for the decision upon priority of invention as more particularly provided for by Rule 130 of the Patent Office Rules of Practice, * * *"; that their patent 2,334,812 and the record of its prosecution before the Primary Examiner, together with twelve other listed patents, would be relied upon "for the purpose of construing the issue of the interference," and that pages 73 and 77 of Principles of Chemical Engineering by Walker, Lewis and McAdams, referred to in the Detrick et al. patent, would be relied upon at final hearing for the purpose of construing the issue.

Following the final decision of the Primary Examiner denying the motion of Detrick et al. to dissolve, testimony was taken in an effort to establish reduction to practice by Giambalvo, in the early part of 1939. Detrick et al. took no testimony and were limited to their filing date of February 23, 1940, for all elements of the invention. The Board of Interference Examiners held that Giambalvo failed to prove reduction to practice, but prior to passing upon that, held that he had no right to make the counts, thus reversing the decision of the Primary Examiner, and, this being treated as a question ancillary to priority, priority was awarded to Detrick et al. upon that ground.

So, the matter comes before us with a decision adverse to Giambalvo upon two grounds, viz., (a) his right to make the counts and (b) conception and reduction to practice.

It is obvious that we need not concern ourselves relative to the second ground unless it be found that the board erred as to the first ground. In other words, if Giambalvo failed to disclose the invention and is unable to make the counts for that reason, he cannot be awarded any date—not even his filing date—for conception and reduction to practice.

■ Extensive briefs have been filed before us on behalf of the respective parties, the invention actually claimed originally in their applications being partially reviewed and much history of the art being recited, but the principal issue, while somewhat technical in character, does not seem to us

to present any particularly difficult questions when the counts are properly interpreted. Having originated with Detrick et al., any uncertainty as to the meaning of terms of the counts must, under the familiar rule, be determined in the light of the patent disclosure.

It is noted that count 1 is directed to a "drowning" step, and count 2 defines a product produced by the process of count 1, which product is said to have a color that is "redder, brighter and stronger than the same color when precipitated from acid solution by conventional drowning methods." There is some evidence, in the form of an affidavit by an employee of the assignee of Detrick et al., that the superiority— assuming it to be superior— in color of the pigments produced by the process involved in the interference is due to a particular physical form and not to the matter of purity.

In explanation of the "significance of this term 'drowning,'" the brief for Giambalvo states (page references to record omitted):

"A crude phthalocyanine pigment is made by causing a metal, such as copper, to react with organic material * * *. This crude pigment is then refined. Impurities are removed by the action of solvents * * *. The pigment is dissolved in a solvent such as sulphuric acid and pure pigment is then precipitated out of that solution * * *. When the pigment is dissolved in this acid solution, it is not essential that all of the impurities in the crude pigment shall have been previously removed. Such impurities as are not precipitated out of the acid solution with the pigment may be present and pure pigment will then be obtained on precipitation * * *.

"It is a characteristic of the phthalocyanine pigments that they are soluble in strong acids such as sulphuric acid but they are not soluble in water. When a solution of phthalocyanine pigment in a strong acid such as concentrated sulphuric acid is mixed with a large excess of water, the pigment is precipitated out of solution in the form of crystals. It is this type of precipitation which is referred to by the term 'drowning' * * * and constitutes the step in the manufacture of phthalocyanine pigments to

which Count 1 is addressed. After the pigment has been precipitated, it is removed from the liquid by filtration."

Subsequently the brief states:

"The old batch method differs from the method of Count 1 in that the latter entails drowning the acid solution of pigment in 'water which is in a state of turbulent flow and in which no laminar flow exists' as a result of which the pigment is prepared 'in an extremely finely divided form' * * *."

The brief for Giambalvo states that the decision in the case depends upon the answers to two questions, the first of which is:

"(a) Is drowning of an acid solution of phthalocyanine pigment in water which is in a state of 'turbulent flow' inherent in the process described in appellant's application."

The second question relates to the Giambalvo's matter of reduction to practice, and has no bearing upon the matter of his right to make the counts.

It is noted that the question is whether the process of the count is *inherent* in the process described in Giambalvo's application. The brief on his behalf before us states (page references omitted):

"It has long been known, as pointed out by appellees' patent * * *, that the properties of a phthalocyanine pigment are dependent in large measure upon the particle size of the pigment. The tinctorial strength and brilliance is increased as the size of the individual pigment crystals is decreased. The size of the pigment crystals is decreased as the speed of precipitation of a phthalocyanine crystal is increased * * *."

In the course of its decision, the board said:

"Since Giambalvo makes no reference in his specification to particle size, turbulent flow and the qualities specified in count 2, he must rely upon inherency in the disclosure for support as to these features." It is obvious from the question posed in the brief for Giambalvo that he concedes that he relies upon inherency for support of essential features of the counts. We hereinafter refer to this matter again. Just at this point we think it proper to consider the "turbulent flow" and lack of "laminar flow" features of count 1, supra.

Those terms were not used in the Giambalvo application. They originated with Detrick et al. and are defined in their patent specification as follows:

"By turbulent flow as used in this specification and claims we refer to that motion of a liquid such as is induced upon it in flowing through a pipe at a velocity greater than its critical velocity and which is characterized by the presence of innumerable eddy currents, as distinguished from the straight line or laminar flow where the liquid although induced to rotate under agitation in currents still flows for an appreciable time without interruption."

The definition of critical velocity adopted by Detrick et al. was taken from Principles of Chemical Engineering, supra, page 75, and is stated in the specification as "the velocity at which the type of motion changes from straight to turbulent flow."

That the phrase "turbulent flow" is used in count 1 as having the technical meaning so stated is, in effect, agreed to by Giambalvo, and it is claimed for him that such is inherent in the process described in his specification, although he made no reference therein to "turbulent flow" nor does his specification define "turbulent flow."

Detrick et al. teach that turbulent flow, in the sense used in their specification, may be created in different ways and Giambalvo's application teaches the feeding of the acid solution and a precipitating liquid (the "drowning" liquid such as water, etc.) simultaneously "into an enclosed region of relatively limited volume, while maintaining the region under conditions of intense agitation," and mentions "an ordinary centrifugal pump," as an example of a "suitable enclosed region." This is one of the instrumentalities named by Detrick et al.

From our study of the record we are convinced that if Giambalvo up to the time the patent was issued to Detrick et al., or their assignee, had any actual knowledge of turbulent flow as used in the patent he failed to disclose it. It is not reasonable to suppose that he had any consciousness of it in January 1939, when he claims to have reduced the invention to practice, else he would have described it in his application. No one reading his specification, not even one skilled in the art, would, in our opinion, obtain any impression that turbulent flow was an agency in his process. Agitation—intense agitation—is recited, but that is not turbulent flow. The Primary Examiner, who denied the motion to dissolve, himself said:

"* * * Turbulent motion is not necessarily produced when a liquid is caused to rotate under agitation. Depending upon the particular conditions agitation may induce laminar flow or turbulent flow or both types of flow, each at different portions of the liquid."

The Primary Examiner concluded, however, apparently largely because of the shortness of time required for passage of the liquid through the pump, that drowning must take place "in a region of turbulent flow."

Of course, it is not intended to suggest that Giambalvo would not be entitled to make the counts if the requisite features were found to be inherent in his application whether he was conscious of that fact or not. In the view which we take of the case it is unnecessary to go into that question.

We are not convinced that the requisite subject matter to support the counts is inherent in Giambalvo's application.

The board seems to have been of opinion that if it had been shown that Giambalvo introduced the acid solution into the pump directly in the region of the turbulent flow which apparently would have been created in his centrifugal pump, he would have been entitled to make the counts, but it said:

"* * * If the acid solution is introduced into the water at a point in the inlet where the turbulent flow does not exist or where there is some laminar flow, then the resulting process would not be within the terms of the counts, and this is the crux of the matter. Examination of the Giambalvo specification fails to reveal how the acid solution is delivered to the inlet end of the pump. There is no drawing or description of this feature and it would be speculation to assume that the acid solution is fed directly into the pump in the region of turbulent flow. No good reason is seen for assuming any operation other than a mixing of liquids prior to entry into the region of intense agitation, in the absence of a contrary disclosure, and this type of mixing

fails to satisfy the terms of count 1 in this regard. It is, therefore, concluded that the necessary inherency is lacking in the Giambalvo specification as to the process of count 1. Since count 2 calls for the pigment which has been precipitated by the process of count 1, it follows that the invention of count 2 is likewise not inherent in the Giambalvo disclosure."

In the case of In re Draeger et al., 150 F.2d 572, 574, 32 C.C.P.A. (Patents) 1217, this court said (citing numerous cases in point):

"Inherency does not mean that a thing might be done, or that it might happen, as in the instant case, one out of twenty odd times; but it must be disclosed, if inherency is claimed, that the thing will necessarily happen."

In view of our conclusion that Giambalvo is not entitled to make the counts because of lack of disclosure, it is unnecessary to discuss the matter of reduction to practice.

The decision of the Board of Interference Examiners is affirmed.

Affirmed.

By reason of illness, O'CONNELL, Associate Judge, was not present at the argument of this case and did not participate in the decision.