38 C.C.P.A.(Patents)

### KROPA v. ROBIE et al.
### Patent Appeal No. 5725.

United States Court of Customs
and Patent Appeals.
Feb. 6, 1951.

James Edwin Archer, Stamford, Conn., for appellant.

William H. Webb, Pittsburgh, Pa., for appellees.

Before GARRETT, Chief Judge, and JACKSON, O'CONNELL, JOHNSON and WORLEY, Judges.

JOHNSON, Judge.

This is an appeal from an adverse award of priority in a patent interference proceeding in the United States Patent Office between a patentee and a patent applicant, in which the Board of Interference Examiners rendered a decision in favor of the patentee. The interference involves the appellant's application of May 21, 1945, said to be a continuation in part via mesne applications of his Serial Nos. 248,535-6-7 applications filed December 30, 1938, and appellees' patent No. 2,369,689, dated February 20, 1945, which issued on an application filed November 6, 1941.

The subject matter of the interference counts is an abrasive article and a method of manufacturing the article, in which abrasive grains are bonded together by a particular kind of synthetic resin. The counts are claims of the Robie et al. patent and were copied by the appellant in his 1945 application. Of the ten counts in issue, counts 1 and 10 are considered illustrative:

"1. An abrasive article comprising abrasive grains and a hardened binder comprising the additive reaction product of a substantially neutral unsaturated monomeric material and an unsaturated esterification product of an aliphatic alcohol and a polybasic acid.

"10. The method of making a dense abrasive article which is substantially free

from porosity which comprises commingling an unsaturated polyester, a substantially neutral unsaturated monomeric material reactive with the said polyester and abrasive grains, shaping an article from the mixture thus prepared, and heating the article to solidify the binder to an infusible state by bringing about an additive reaction between the monomeric material and the polyester to crosslink polyester molecules."

As this contest for priority of invention comes before us, each party relies on its filing date as a constructive reduction to practice of the invention defined by the counts. The issue before us turns on whether or not appellant's 1945 application may properly be considered a continuation in part of his 1938 applications. The copendency of appellant's 1945 application with mesne applications in turn copending with his 1938 applications is not disputed. Nor is it disputed that the 1938 applications sufficiently disclosed the resins specified by the counts. What is disputed is that the 1938 applications disclose an abrasive article comprising abrasive grains and a binder of the particular resin or a method of manufacturing the same. Each of the 1938 applications is directed to "resinous compositions and processes of producing" them, an object of each being "to prepare improved resins and especially to obtain clear, colorless gels."

Appellant's 1938 applications do not expressly disclose an "abrasive article." In each of the applications, which are voluminous ones, appears the following statement:

"Alternatively the reactive resin-reactive solvent combination may be mixed with one or more of the various fillers, e. g. wood flour, wood fiber, paper dust, clay, zein, glass wool, mica, granite dust, silk flock, cotton flock, steel wool, carborundum, paper, cloth, sand, white, black or colored pigments, etc."

Appellant contends that the words "abrasive article" or "abrasive products" in the counts should be given no weight. He states that any combination of abrasive grains and binder is inherently an abrasive article, and since the counts contain no limitations whatever as to the proportions of abrasive grains or binder, the counts should be read in the broadest possible manner. So read, urges appellant, they cover any and all combinations of abrasive grains with the binders specified in the counts. Since his 1938 applications disclose the addition of abrasive grains such as "carborundum," sand, and granite dust to the resins specified by the counts, appellant contends, those applications contain an adequate disclosure of the subject matter of the counts.

In ruling on a motion of appellees to shift the burden of proof, based on the contention that the appellant's 1938 applications do not support the counts of the interference, the Primary Examiner ruled in favor of appellant, sustaining contentions similar to those advanced by appellant here. The Board of Interference Examiners, however, after considering the evidence introduced by the parties, differed from the conclusion of the Primary Examiner and held that the appellant's 1938 applications do not explicitly or inherently disclose the subject matter of the counts.

The issues presented for our decision are:

I. Does the phrase "An abrasive article" (and the similar term in the process counts) introduce a limitation into the counts?

II. Is a disclosure of "An abrasive article" and method of making the same inherent in the appellant's 1938 applications?

I. In an interference proceeding the counts are to be given the broadest interpretation which their language reasonably will permit, Malm v. Schneider, 101 F.2d 201, 26 C.C.P.A., Patents, 783, 786; Mantz v. Kronmiller, 168 F.2d 100, 35 C.C.P.A., Patents, 1189; Osborne v. Patterson, 169 F.2d 817, 36 C.C.P.A., Patents, 719, however express limitations appearing in counts are not to be disregarded but must be considered as material. Malm v. Schneider, supra; Saklatwalla v. Marburg, 172 F.2d 227, 36 C.C.P.A., Patents, 791.

Is the phrase "An abrasive article" a limitation upon what follows in the counts in issue? This court has often had before it the Jepson problem (243 O.G. 525—1917)

—whether the preamble to claims in *ex parte* cases or to the counts in interference cases should be considered as limitations in the claims or counts. Of the thirty-seven cases of this court we have reviewed with respect to this problem it appears that the preamble has been denied the effect of a limitation where the claim or count was drawn to a structure and the portion of the claim following the preamble was a self-contained description of the structure not depending for completeness upon the introductory clause; or where the claim or count was drawn to a product and the introductory clause merely recited a property inherent in the old composition defined by the remaining part of the claim. In those cases, the claim or count apart from the introductory clause completely defined the subject matter, and the preamble merely stated a purpose or intended use of that subject matter. On the other hand, in those *ex parte* and interference cases where the preamble to the claim or count was expressly or by necessary implication given the effect of a limitation, the introductory phrase was deemed essential to point out the invention defined by the claim or count. In the latter class of cases, the preamble was considered necessary to give life, meaning and vitality to the claims or counts. Usually, in those cases, there inhered in the article specified in the preamble a problem which transcended that before prior artisans and the solution of which was not conceived by or known to them. The nature of the problem characterized the elements comprising the article, and recited in the body of the claim or count following the introductory clause, so as to distinguish the claim or count over the prior art. There is set forth in an appendix to this opinion an analysis of the thirty-seven cases mentioned to which further reference may be made.

■■■ In the case before us, the words "An abrasive article" are essential to point out the invention defined by the counts. In our judgment those introductory words give life and meaning to the counts, for it is only by that phrase that it can be known that the subject matter defined by the claims is comprised as an abrasive article.

Every union of substances capable *inter alia* of use as abrasive grains and a binder is not an "abrasive article." The term calls forth a distinct relationship between the proportions of grain and resin comprising the article. It is important here, as it was in Hall v. Shimadzu, 59 F.2d 225, 19 C.C.P.A.Patents, 1288, that the interference counts originated in one party's patent where the entire object of the patent is expressed in the introductory clause of the counts—an objective which nowhere appears in the other party's disclosure (here, appellant's 1938 applications). The term "abrasive article" is a vital term of the counts, and the meaning must be taken from the application in which the counts originated. Kenyon v. Crane, 120 F.2d 380, 28 C.C.P.A.Patents, 1208. We hold that it is a limitation which is material to the issue, and must be observed.

II. The above quoted excerpt from appellant's 1938 applications does not inherently disclose an abrasive article. First, the language of that excerpt expressly refers to the enumerated items as "fillers." Thus, though "carborundum" (silicon carbide), sand, and granite dust under some circumstances may be considered as abrasive grains, their enumeration with various other substances not capable of use as abrasive grains, together with appellant's own characterization of the substances as "fillers" is no suggestion that the resin of his 1938 applications be mixed with any of those substances *qua* abrasive grains. *Ejusdem generis.* Secondly, the mixture of the resin with "carborundum," sand, or granite dust in proportions commonly understood as appropriate for the addition of a filler would not inevitably—if at all—yield an abrasive article as that term is understood by the art and indeed contemplated by appellees' patent where the counts originated.

The record fairly establishes that the proportions of silicon carbide, sand, or other substances customarily added to a resinous composition as a filler are distinctly and greatly different than the proportions generally regarded in the abrasive industry as appropriate where "filler" substances, usable as abrasive grains, are mixed as

such with a resinous binder to produce an abrasive article. We believe the testimony of the following witnesses preponderates to that effect.

Mr. Boyd H. Work, director of the abrasive engineering department of the Carborundum Company, testified that in commercial practice the relationship between abrasive grain and bond was 70% grain to 30% bond for vitrified bonds, and 80% grain to 20% bond for resinoid bonds. General industry practice does not differ materially from that of the Carborundum Company, he stated, and of Carborundum's 24,000 items of bonded abrasives, none had less than 70% abrasive grain.

Mr. Work testified that fillers are sometimes used in the manufacture of abrasive articles. Silicon carbide, often referred to in the record as "carborundum," is used both as abrasive grains and as a filler. When used as a filler, silicon carbide is used in fine grain sizes, usually finer than 150 mesh. As a filler, its use is for the purpose of changing the action or bonding characteristics of the bond, and not to abrade or increase abrasion. The relative difference between the grain size of the filler and the abrading grains is considerable. Where filler is used in the manufacture of an abrasive article, the relationship between filler, bond, and grain is such that the filler will not exceed 50% *of the bond,* while the proportion of abrasive grain to bond-filler remains as before—not less than 70%. Stock removal by an abrasive article depends, Mr. Work stated, on keeping the bond percentage down and the abrasive percentage high. Filler substances are only added as fine grits, and these fine grits are included *in* the bond and produce very little cutting action. It is the abrasive grains which protrude beyond the bond to quite a considerable extent which do the cutting—not the grains included in it. Where silicon carbide alone is added in a fine grit or 150 mesh size to the resin, the resulting product might be considered an abrasive article *if* the percentage of grit is in the range where it becomes an abrasive.

Mr. Frederick Upper, manager of manufacturing technical service for the Carborundum Company, testified that in manufacturing abrasive articles where the abrasive grain is silicon carbide or aluminum oxide, that at the finest grit size of either used for abrasive purposes, the percentage of resin required as a bonding medium would be on the average 12 to 15%. He stated that Carborundum Company had never made resin molded abrasives with more than 20% bond. The reason for the small quantity of bond compared to the quantity of abrasive grain, he explained, was that in most grinding wheels minimum bond is desired as it does little or no cutting. If as much as 50% resin and as little as 50% abrasive grain were used, he did not believe a useful abrasive wheel would result.

Mr. Upper testified that fillers are used in the manufacture of some molded abrasives, in which case the article comprised abrasive grains, filler, and bonding medium. The relationship between the percentage of abrasive grains and the percentage of bond plus filler used remained the same, he stated, as in the manufacture of resin bonded molded abrasives without a filler—not less than 80% abrasive grain.

Dr. Edward L. Kropa, the appellant in this case, an employee of his assignee, the American Cyanamid Company, stated that he had no experience in the abrasive industry as such. He testified that he was in charge of the group working on resins and plastics at American Cyanamid. Resins used in most molding compositions, he stated, require the addition of other materials, such as fillers. The type of resin he was dealing with he described as unusual and often the introduction of small amounts of extraneous compounds would affect the cure. Among the compounds tested as fillers were sand and silicon carbide. Dr. Kropa described a filler as a material usually introduced into a molding compound in order to extend the plastic composition. He stated that it was conceivable that one could extend a material with sand or something of that nature, "but it would be for some secondary purpose rather than a cutting action." After stating that a filler to his way of thinking "is a term which at least by secondary chemical forces of some kind, reacts with the resin binder itself," he said

154

that materials not combining chemically with the resin could be used, but as extenders rather than fillers. When counsel quoted and showed Dr. Kropa the excerpt from one of his 1938 applications, which we quoted in introductory portion of this opinion, stating that the resin defined by the counts "may be mixed with one or more of the various fillers," enumerating various substances including "carborundum," and sand, Dr. Kropa after some interrogation stated that his definition (specifying a chemical combination with the resin as a characteristic of a filler) was of an "ideal" filler, whereas he "was using 'filler' in the common definition in the specification."

Dr. Kropa would not agree with a definition of filler as given in the *Handbook of Plastics* by Simonds and Ellis, published by D. Van Nostrand Co. in 1943, to the effect that a filler is "An inert material which may be added to a resin or other binder for cheapening or for modifying mechanical properties, or to serve as a base for color effects," but then stated that "If you acknowledge a chemical reaction, it then becomes a part of the binder," adding "If there isn't a chemical combination, then it must be a filler." He admitted that fillers are frequently used to extend the resin, and specified that where fillers are used for such a purpose, the proportion of filler to resin is "Usually in about equal weights." When asked if the percentage of filler is not frequently less than 40 per cent, he replied that "frequently it can be for certain specific uses," adding, however, that "It is usually around equal weights." He testified that "carborundum" was one of the fillers he disclosed to his patent attorney as a filler which could be employed in his new resin compositions.

Dr. Kropa acknowledged as essentially satisfactory a definition quoted from *The Technology of Plastics and Resins,* by Mason and Manning, published by D. Van Nostrand Co. in 1945, as follows:

"Filler: 35–50 per cent. Materials * * added for the purpose of extending the resin and then modifying the properties of the finished product."

He indicated, however, that the limits would be within the 50% region (% of filler in the composition).

As to the proportion of abrasive grain to resinous material in an abrasive product, Dr. Kropa's testimony included the following:

"XQ 180. Do you know of any abrasive product in which you have, we will say, 30 per cent of abrasive grain, bonded by 70 per cent resinous material? A. Not in that ratio, no. I believe the abrasive would be considerably higher.

"XQ 181. That is the amount of abrasive would be considerably in excess of, say, 30 per cent? A. Seventy of abrasive and thirty of filler would be within shouting distance of it."

It thus appears from the record that the production of an abrasive article by the bonding of abrasive grains with a resin requires as a general rule that the article be comprised of abrasive grains and resin in the proportion of at least 70% abrasive grain and 30% resinous material, whereas the addition of a substance into a resinous composition as a filler is customarily accomplished at the relationship wherein the filler substance is 50% or less of the resin composition. It seems indisputable, therefore, that a resin artisan practicing the suggestion of the appellant's 1938 applications of adding "carborundum" or sand to the resins there disclosed in the proportions customary and appropriate for fillers would not inevitably or necessarily produce an abrasive article as that term is commonly known and understood in the abrasives industry. The disparity between the well known percentage of material to be added to the resin as a filler and that to be added for an abrasive article is too great to admit of the conclusion that an artisan practicing the former would inevitably secure the latter. Appellant's reliance on the doctrine of inherency to transmute his 1938 disclosure into support for the counts at bar is thus a misplaced reliance. Inherency does not mean that a thing might happen one out of twenty times. The fact that it might yield an abrasive article is not enough. It must inevitably happen for the

doctrine to apply. Giambalvo v. Detrick, 168 F.2d 116, 35 C.C.P.A., Patents, 1112; In re Draeger, 150 F.2d 572, 32 C.C.P.A., Patents, 1217; Hansgirg v. Kemmer, 102 F. 2d 212, 26 C.C.P.A., Patents, 937.

██ We conclude, therefore, that appellant's 1938 disclosure does not meet the limitation of the counts, nor will compliance with the suggestion pertaining to the use of "carborundum", sand, etc. as fillers appearing in his voluminous 1938 applications inherently yield an abrasive article. The board was correct in refusing to award appellant his 1938 filing date for a constructive reduction to practice of the subject matter of the counts here in issue. The board's award of priority of invention to appellees must stand, and the decision appealed from is affirmed.

Affirmed.

APPENDIX to KROPA v. ROBIE et al., P.A. 5725, Interference No. 82,123.

A. *Ex parte cases in which preamble held not to express limitation in claim.*

| No. | Case | CCPA (Patents) Vol. | Page | F.2d Vol. | Page | USPQ Vol. | Page | Introductory Clause |
|-----|------|------|------|------|------|------|------|---------------------|
| 1. | In re Dawe | 19 | 728 | 53 | 543 | 11 | 181 | A driving wheel for tractors and similar agricultural implements |
| 2. | In re Abrahamsen | 19 | 1056 | 56 | 871 | 13 | 196 | A moulding scraper |
| 3. | In re Weingartner | 19 | 1202 | 58 | 442 | 13 | 199 | A stoker-drive power box |
| 4. | In re Garratt | 20 | 878 | 63 | 113 | 16 | 369 | In a device of the class described |
| 5. | In re Wolfe * | 21 | 974 | 69 | 550 | 21 | 105 | In a refrigerator cabinet |
| 6. | In re Schoenky | 21 | 1052 | 69 | 982 | 21 | 236 | In a shoe-conveying system |
| 7. | In re Beplate et al. | 22 | 1232 | 77 | 506 | 25 | 386 | In a carrying apparatus for use in the drying of a plurality of rows of filaments in skein form |
| 8. | In re Allen ** | 24 | 1066 | 88 | 705 | 33 | 160 | A cutting tool for high speed rotary cutting of non-metallic materials |
| 9. | In re Mason | 25 | 873 | 94 | 220 | 36 | 337 | In separating apparatus for separating the silicious and phosphatic constituents of oiled fine mineral phosphates |
| 10. | In re Walker et al. | 26 | 739 | 99 | 976 | 39 | 485 | A blowpipe nozzle for removing surface metal from ferrous metal bodies by reaction with an oxidizing gas stream applied to the surface thereof |

Notanda: * – semble

** – While the introductory clause may have been considered a limitation, it was not a patentable limitation

| No. | Case | CCPA (Patents) Vol. | Page | F.2d Vol. | Page | USPQ Vol. | Page | Introductory Clause |
|-----|------|------|------|------|------|------|------|---------------------|
| 11. | In re Crabbs * | 25 | 1214 | 97 | 349 | 37 | 740 | In an asbestos cement shingle |
| 12. | In re Waldron | 28 | 862 | 117 | 381 | 48 | 381 | A rock splitting tool |
| 13. | In re Jannell | 28 | 1262 | 120 | 1012 | 50 | 51 | Apparatus for the manufacture of thread or the like in which the thread or the like is at all times accessible from a working face defined as a vertical plane paralleling the longitudinal axis of the apparatus as a whole |
| 14. | In re Stacy | 30 | 972 | 135 | 232 | 57 | 307 | In a fluid operated motor for drawing metal blanks where if the resistance of the blank to the drawing operation suddenly lessens during the drawing operation, the ram element may jump ahead |
| 15. | In re Thuau | 30 | 979 | 135 | 344 | 57 | 324 | A new therapeutic product for treatment of diseased tissue |
| 16. | In re Lamb | 32 | 799 | 146 | 277 | 64 | 241 | In a scaffold of the character described |
| 17. | In re Jacobson et al. | 32 | 970 | 148 | 1011 | 65 | 425 | Apparatus for selective testing of combustible gases with different ignition temperatures including |
| 18. | In re Rockwell | 32 | 1177 | 150 | 560 | 66 | 215 | A power unit for intensifying and modulating hydraulic pressure * * said power unit comprising |
| 19. | In re Hutchinson | 33 | 879 | 154 | 135 | 69 | 138 | As an article of manufacture adapted for use in the fabrication of a metal template or the like suitable for metal-working operations |
| 20. | In re Dense | 33 | 1171 | 156 | 76 | 70 | 212 | A floor mat |
| 21. | In re Benner et al | 36 | 1081 | 174 | 938 | 82 | 49 | A ball mill lining element |
| 22. | In re Hooker | 36 | 1164 | 175 | 558 | 82 | 190 | In photo-electric target apparatus |

Notanda:　*　— semble

| No. | Case | CCPA (Patents) Vol. | Page | F.2d Vol. | Page | USPQ Vol. | Page | Introductory Clause |
|-----|------|------|------|------|------|------|------|---------|
| 23. | In re Hansen et al | 37 | 1169 | 183 | 92 | 86 | 390 | In apparatus for measuring high frequency power<br><br>The method of measuring high frequency power by means of a bridge circuit having one element variable in resistance in accordance with excitation thereof |

In the foregoing cases (A–1 through 23) the following were the principal reasons advanced for not considering the introductory clause to be a limitation in the claim:

In combination claims the invention must be found in the combination of elements making up the device. An introductory phrase is merely the title of the invention defined in the part of the claim following that clause. (Case A–1).

The introductory clause merely indicated a field of use different than the field of use of prior art devices, but the structure defined in the body of the claims following the introductory clause pertains to the same art as the prior art devices and is not inventive over that art. While the field of use of the respective devices differs, the art is the same. (Case A–3).

Where the structure is completely defined independently of the preamble of the claim and can be constructed from the description given, the preamble does not constitute a limitation upon structure but merely states a purpose or intended use of the structure. (Case A–7).

The introductory clause merely recites a property inherent in the old composition defined by the remaining part of the claim. (Case A–15).

In a process claim, where every physical step is anticipated by a reference, the introductory clause stating the purpose of the process is not a limitation, as it is immaterial what purpose the patentee had in mind. (Case A–23).

B. *Ex parte cases in which the preamble either expressly or by necessary implication was considered to be a limitation upon the subject matter defined by the claim*

| No. | Case | CCPA (Patents) Vol. | Page | F.2d Vol. | Page | USPQ Vol. | Page | Introductory Clause |
|-----|------|------|------|------|------|------|------|---------|
| 24. | In re Fawick * | 19 | 1124 | 56 | 873 | 13 | 92 | In a transmission<br><br>In an automobile vehicle having a spring supported frame |
| 25. | In re Covey * | 20 | 962 | 63 | 982 | 17 | 240 | In a tire |
| 26. | In re Bennett | 20 | 1087 | 65 | 144 | 17 | 485 | A sheet steel barrel construction for barrels formed of heavy gauge sheet steel and adapted for shipment of heavy contents weighing in the hundreds of pounds |

Notanda – * – semble.

| No. | Case | CCPA (Patents) Vol. | Page | F.2d Vol. | Page | USPQ Vol. | Page | Introductory Clause |
|---|---|---|---|---|---|---|---|---|
| 27. | In re Buttolph | 22 | 802 | 73 | 936 | 24 | 85 | A discharge tube for positive column light |
| 28. | In re Reichel | 23 | 1293 | 84 | 221 | 30 | 74 | An expansible diaphragm device |
| 29. | In re Krasnow * | 33 | 764, 152 768-9 | | 969 | 68 | 210 | In an apparatus for measuring radioactivity within a borehole |

In the foregoing cases (B–24 through B–29) the following were the principal reasons advanced for considering the introductory clause a limitation in the claim:

The applicant was the first to provide the article described in the introductory clause comprised of the elements recited in the remainder of the claim (Case B–24) the existence of which latter, while previously known was not obviously useful in the environment specified in the introductory clause, and which use solved a problem, the solution of which had been sought for years by the industry (Case B–25).

Where there inhered in the article specified in the introductory clause a problem whose solution transcended that before prior artisans, the nature of that problem characterizes the elements comprising the article, recited in the body of the claim following the introductory clause, and distinguishes the claim over the prior art. (Case B–26).

The introductory clause constituted an essential element in the novelty of the device, and constitutes a limitation in the claim (Case B–27).

C. *Interference cases in which introductory clauses were held not to express a limitation in the counts.*

| No. | Case | CCPA (Patents) Vol. | Page | F.2d Vol. | Page | USPQ Vol. | Page | Introductory Clause |
|---|---|---|---|---|---|---|---|---|
| 30. | Braren v. Horner | 18 | 971 | 47 | 358 | 8 | 455 | In an engraving machine and the like |
| 31. | Deutsch et al. v. Ball | 22 | 1322 | 77 | 930 | 25 | 470 | A collapsible top for vehicle bodies of the cabriolet or convertible coupe type |
| 32. | Marden et al. v. Braselton | 28 | 1077 | 119 | 174 | 49 | 256 | An ultraviolet lamp |
| 33. | Bartsch v. Baker | 30 | 919 | 134 | 487 | 57 | 143 | A dish for maintaining food at a desired temperature |

In the foregoing cases (C–30 through C–33) the following were the principal reasons advanced for considering the introductory clause not to be a limitation in the count:

The structure recited in the count following the introductory clause was a self-contained description and did not depend for completeness upon the introductory clause. That clause merely stated the particular use to be made of an otherwise integral apparatus or mechanism (Case C–30).

The structure defined in the counts exclusive of the preamble was a complete and definite invention irrespective of the intended use recited in the preamble (Case C–31).

Notanda – * – semble.

*D. Interference Cases in which introductory clauses were expressly or impliedly held to express a limitation in the counts.*

| No. | Case | CCPA (Patents) Vol. | Page | F.2d Vol. | Page | USPQ Vol. | Page | Introductory Clause |
|-----|------|------|------|------|------|------|------|---------------------|
| 34. | Hall v. Shimadzu | 19 | 1288 | 59 | 225 | 13 | 259 | A process of manufacturing a fine powder of lead suboxide intermingled with powder of metallic lead |
| 35. | Smith v. Bousquet | 27 | 1136, 1144 | 111 | 157 | 45 | 347 | An insecticide<br>An insecticide composition |
| 36. | Kenyon v. Crane | 28 | 1208 | 120 | 380 | 49 | 707 | A directional indicator for aircraft showing the direction and amount of deviation from course |
| 37. | Lawson v. Davis | 29 | 1217 | 129 | 873 | 54 | 405 | In an article of hosiery<br>A knitted article of apparel |

In the foregoing cases (D–34 through D–37) the following were the principal reasons advanced for considering the introductory clause a limitation in the counts:

The introductory phrase is absolutely essential to point out the invention defined by the counts. The introductory phrase is necessary to give life, meaning, and vitality to the counts. Also, the counts originated in one party's patent where the entire object of the patent was expressed in the introductory clause of the counts, which objective nowhere appears in his opponent's disclosure. (Case D–34).

The preamble is a limitation where it specifies an article or composition in which there inheres a field of specific use, and the constituents of the article which are recited in the portion of the count following the preamble are old compounds not theretofore known to be useful in such an article. (D–35).

The preamble is an essential element of the invention defined by the counts and not merely introductory for the purpose of explaining the environment in which the other structural elements of the count are designed to be used. Moreover where a vital term of a count is susceptible of more than one interpretation, the meaning must be taken from the application in which the counts originated. (Case D–36).