NOTE: This disposition is nonprecedential.

# United States Court of Appeals
# for the Federal Circuit

---

**TEXTRON INNOVATIONS INC.,**
*Plaintiff-Appellant,*

v.

**AMERICAN EUROCOPTER CORPORATION**
(also known as American Eurocopter, LLC)
**AND EUROCOPTER,**
*Defendants-Appellees.*

---

2011-1309

---

Appeal from the United States District Court for the Northern District of Texas in Case No. 09-CV-0377, Judge John H. McBryde.

---

Decided: September 7, 2012

---

SCOTT L. ROBERTSON, Goodwin Procter LLP, of Washington, DC, argued for plaintiff-appellant. With him on the brief were CHARLES H. SANDERS, of Boston, Massachusetts; and MICHAEL S. DEVINCENZO, CALVIN E. WINGFIELD, JR., and TIMOTHY J. ROUSSEAU, of New York, New York.

ROY W. HARDIN, Locke Lord, LLP, of Dallas, Texas, argued for defendants-appellees. With him on the brief were MICHAEL V. POWELL and MARK R. BACKOFEN.

_____

Before NEWMAN, CLEVENGER, and BRYSON, *Circuit Judges*.

BRYSON, *Circuit Judge*.

In this litigation, a helicopter manufacturer has accused a competitor of infringing its patent covering helicopter landing gear assemblies. The district court granted summary judgment in favor of the defendant, concluding that in light of the court's construction of certain claim terms, there was no infringement. We reverse and remand.

I

Textron Innovations Inc. is the owner of U.S. Patent No. 5,462,242 ("the '242 patent"). The patent describes a way of attaching a skid-type landing gear assembly to the fuselage of a helicopter by using brackets and other components. Claim 10, the independent claim asserted in this action, reads as follows:

10. An improved replacement helicopter landing gear assembly, of the type having a bracket extending from the helicopter fuselage into engagement with a strap on top of a generally cylindrical crosstube that supports landing devices, the bracket engaging the strap and stabilizing the fuselage with respect to the crosstube, the improvement comprising:

the strap having an inner surface adapted to engage an outer surface of the crosstube;

the strap having an outer surface including a stop surface for mating with the bracket to minimize lateral movement of the bracket on the strap;

the strap extending over the top of the crosstube and generally one half around the crosstube, terminating in two lower edges that extend axially with respect to the tube;

the strap having a plurality of strap fastener holes located proximate to the neutral bending axis of the crosstube to minimize stress at the strap fastener holes, the strap being otherwise imperforate to minimize stress concentration;

the crosstube having crosstube fastener holes registering with the strap fastener holes on the strap;

the strap being fastened to the crosstube through the strap fastener holes and the crosstube fastener holes; and

the crosstube being made of a material which, in a crosstube configuration, has a ratio of fatigue strength over yield strength of not less than 0.35.

Figures 2 and 2A from the patent illustrate the way the crosstube is attached to the fuselage of the helicopter:



Fig. 2

Fig. 2A

The patented apparatus describes a bracket consisting of two parts (22a and 22b) that clamp around the landing gear crosstube (14). To minimize lateral movement of the crosstube with respect to the helicopter body, a strap (20) is affixed to the crosstube. The strap has a ridge-like projection, referred to as a stop surface, and the stop surface "mat[es] with the bracket to minimize lateral movement." '242 patent, col. 7, ll. 20-21.

In 2009, Textron filed this action against Eurocopter and its American subsidiary, claiming that the landing gear assemblies installed on Eurocopter's EC120 helicopter infringed the '242 patent. Eurocopter moved for summary judgment of noninfringement. Among the grounds raised by Eurocopter in support of its motion were (1) that the claims of the '242 patent were expressly

limited to replacement landing gear assemblies, and the assemblies on the EC120 were not replacement assemblies but original equipment; and (2) that there could be no infringement, either literally or under the doctrine of equivalents, because the accused design did not have a strap that mated with a bracket that fit on top of the strap.

The accused device differs in its structure from the patented invention. Rather than having a single "strap" that mates with the bracket, the accused design has a rubber gasket on which the bracket rests and stop pieces that mount to either side of the bracket, as illustrated below:



In the accused device, as in the patented invention, the bracket consists of two parts: a bottom part (440) and a corresponding top part (not shown in the illustration). Together the two bracket parts clamp around the crosstube (also not shown). Unlike the patented invention, however, the top part of the bracket in the accused structure sits on a rubber gasket (450) rather than on a rigid strap attached to the crosstube. The rubber gasket does not minimize the lateral movement of the crosstube by

itself; instead, two stop pieces (both labeled 380) are attached to the crosstube on either side of the bracket to serve that function. The side ridges of the rubber gasket are interposed between the bracket and the stop pieces, so that the stop pieces do not directly contact the bracket.

The district court granted summary judgment to Eurocopter. *Textron Innovations, Inc. v. Am. Eurocopter, LLC*, 773 F. Supp. 2d 650 (N.D. Tex. 2011). The court construed the term "replacement" as denoting "the intent that the invention, an improved helicopter landing gear assembly, is to be used as a replacement for a landing gear assembly already installed on a helicopter and that its construction be suitable for that purpose." *Id.* at 658-59. The court based its construction mainly on the prosecution history, noting that the addition of the word "replacement" in an amendment to the claim after an initial rejection was meant to give that word an entirely different meaning than the word "improvement," which was used in the original claims. *Id.* at 659. The court rejected Textron's argument that "improved replacement" in the asserted claims means an improvement over the prior art in a device that can be used to replace prior art structures. The court was persuaded that "clear reliance on the preamble during prosecution to distinguish the claimed invention from the prior art transforms the preamble into a claim limitation because such reliance indicates use of the preamble to define, in part, the claimed invention." *Id.*, quoting *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002). Based on that construction, the court concluded that landing gear assemblies installed as original equipment by Eurocopter could not infringe the '242 patent. *Id.* at 661.

The district court also found that there was no literal infringement of the '242 patent because the accused device did not possess a "strap" of the sort recited in the patent. The court construed the limitation requiring a "strap having an outer surface including a stop surface for mating with the bracket to minimize lateral movement of the bracket on the strap," to mean that the bracket "seats on the strap" and that the "stop surface of the strap contacts the bracket to minimize movement." The court found that limitation not to be satisfied in the accused assemblies because they lacked a strap with the structure recited in the claim language as the court construed it. *Textron*, 773 F. Supp. 2d at 662-63. The court stated that the rubber gasket in Eurocopter's design could not be considered a strap because it had no holes. *Id.* at 663. The court further concluded that the stop pieces, which have holes, could not satisfy the limitation defining the structure of the strap because the "bracket does not clamp around or seat on top of the stop pieces." *Id.* Additionally, the court noted, the stop surfaces on the stop pieces contacted the sides of the rubber gasket, not the bracket itself, as required by the court's construction of the claim. *Id.* The court also stated that there was insufficient evidence to support Textron's claim of infringement under the doctrine of equivalents, but it did not elaborate on that ruling. *Id.* at 663-64.

II

On appeal, Textron attacks both grounds for summary judgment. First, it asserts that the trial court impermissibly imported a use limitation into an apparatus claim when it construed the patent to require that the landing gear assemblies recited in the claims be used to replace original landing gear assemblies. Second, it asserts that the court erred in concluding as a matter of

law that there was no infringement, either literally or under the doctrine of equivalents. Textron contends that a reasonable fact finder could find that the gasket and the stop pieces of the accused design satisfy the "strap" limitations, either literally or by equivalents, including the limitation requiring the outer surface of the strap to have "a stop surface for mating with the bracket."

## A

Textron first argues that the district court erred by limiting the claim solely to replacement landing gear assemblies because such an interpretation impermissibly reads a use limitation into an apparatus claim. According to Textron, the fact that the claim was written in Jepson format confirms that the patented invention was meant to replace the prior art, not that it was intended to cover only replacement landing gear assemblies. Eurocopter disagrees, arguing that the amendment to the claim supports the court's construction that the claimed landing gear assemblies must be suitable for, and used as, replacement assemblies.

When a patentee "uses the claim preamble to recite structural limitations of his claimed invention, the PTO and courts give effect to that usage." *Rowe v. Dror*, 112 F.3d 473, 478 (Fed. Cir. 1997). However, when a patentee "defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention, the preamble is not a claim limitation." *Id.*; *see Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999) (explaining that if "the body of the claim fully and intrinsically sets forth the complete invention, including all of its limitations, and the preamble offers no distinct definition of any of the claimed invention's limitations, but rather

merely states, for example, the purpose or intended use of the invention, then the preamble is of no significance to claim construction because it cannot be said to constitute or explain a claim limitation"); *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1257 (Fed. Cir. 1989); *Kropa v. Robie*, 187 F.2d 150, 152 (CCPA 1951). The question whether the court should "treat a preamble as a limitation is a determination 'resolved only on review of the entire . . . patent to gain an understanding of what the inventors actually invented and intended to encompass by the claim.'" *Catalina Mktg.*, 289 F.3d at 808, quoting *Corning Glass*, 868 F.2d at 1257.

In certain circumstances functional language may be used to add limitations to an apparatus claim. *See K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1363 (Fed. Cir. 1999); *Wright Med. Tech., Inc. v. Osteonics Corp.*, 122 F.3d 1440, 1443-44 (Fed. Cir. 1997). In cases in which functional language adds a structural limitation to an apparatus claim, however, it does so because the language describes something about the structure of the apparatus rather than merely listing its intended or preferred uses. *See, e.g., K-2*, 191 F.3d at 1363 ("[T]he functional language tells us something about the structural requirements of the attachment between the bootie and the base [of an inline skate] . . . ."). By contrast, in this case there is nothing about the term "replacement" that dictates any structural feature for the claimed limitation. *See IMS Tech., Inc. v. Haas Automation, Inc.*, 206 F.3d 1422, 1434 (Fed. Cir. 2000) ("The phrase 'control apparatus' in the preamble merely gives a descriptive name to the set of limitations in the body of the claim that completely set forth the invention. Its use does not limit the claims . . . to a control apparatus that is separate from the machine tool. The claim is infringed by any apparatus encompassing all of the limitations in the body of the claim.").

This case differs from *Rowe*, cited by Eurocopter, because the court in *Rowe* found that the term "angioplasty" in the preamble phrase "balloon angioplasty catheter" imposed structural limitations on the claimed catheter rather than merely specifying its intended use. 112 F.3d at 479. In *Rowe*, the court explained, the specification indicated "a particular and distinct structural meaning for 'balloon angioplasty catheter' that distinguishes it from 'balloon catheters' generally. In particular, an angioplasty catheter must be capable of 'expand[ing] a stenosis in a coronary artery.'" *Id*. at 479-80. The court thus limited the claims to "catheters that can be inflated radially outward to dilate a narrowed region in a blood vessel." *Id*. at 480. In *Rowe*, the specific use of the catheter for angioplasty dictated the structure that the catheter needed to have—it had to have the capacity to be "inflated radially outward." Here, in contrast, the term "replacement" does not impose any structural limitations on landing gear assemblies used as replacement parts that differ from the structure of original equipment landing gear assemblies that satisfy the limitations in the body of the claim.

Moreover, the entire preamble consists of a general description of the context in which the "improvement" recited in the body of the claim is situated. The other portions of the preamble describe the landing gear assembly as being "of the type having a bracket extending from the helicopter fuselage into engagement with a strap on top of a generally cylindrical crosstube that supports landing devices," in which "the bracket engag[es] the strap and stabiliz[es] the fuselage with respect to the crosstube." Those portions of the preamble plainly contain words of context, not limitation. They describe the general type of landing gear assembly for which the claim provides an improvement, and they describe the function

of the bracket-strap combination in stabilizing the fuse-lage with respect to the crosstube. They do not, however, prescribe the particular limitations of the invention. In that setting, the reference to "replacement helicopter landing gear assembly" likewise should not be interpreted as a limitation of the claim.

In support of its argument that the term "replace-ment" is limiting and confines the claimed invention to devices used to replace original equipment, Eurocopter points out that Textron added the term "replacement" during the prosecution of the '242 patent in order to overcome the examiner's initial rejection. Eurocopter asserts that the amendment of the claim language neces-sarily means that Textron intended to limit the claim to replacement assemblies. But the prosecution history does not support that inference. Claim 10 was initially re-jected as obvious in view of U.S. Patent No. 3,716,208 to Fagan.[1] The examiner rejected the claim because Fagan disclosed a similar strap design. In response, Textron amended the claims. The amended claims not only added the term "replacement" to the preamble but, more impor-tantly, added the limitation that the strap is "otherwise imperforate to minimize stress concentration." That amendment was important because Textron's strap had fewer holes in it than the Fagan strap, and the holes were in a different location. The amendment explained that the "imperforate" limitation meant that Fagan did not anticipate the invention: "Fagan teaches away from

---

[1]   Although portions of the prosecution history were directed to claim 1, that claim is almost identical to claim 10, and the examiner treated the claims similarly. Be-cause the claims do not differ in any respect that is perti-nent to this appeal, we do not distinguish between them for purposes of analyzing the prosecution history.

locating the fastener holes only near the neutral bending axis of the crosstube."

Addressing the obviousness rejection, Textron focused on two critical limitations of each claim: "the fastener holes being only near the neutral bending axis of the crosstube" and the particular material strength and fatigue ratios specific to each claim. According to Textron, "Fagan teaches away from locating the fastener holes only near the neutral bending axis" of the crosstube and "teaches away from using the materials claimed in claim 10 in that instead of teaching a particular material to use, Fagan teaches the use of [a] liquid spring shock unit." Notably, the amended application was silent as to why the term "replacement" was added. There was no express statement in the amendment or elsewhere that the term "replacement" was added to overcome the rejection by limiting the invention to replacement parts only.

In the context of the entire patent, it is apparent that the term "replacement" is intended to describe the principal intended use of the invention, but not to import a structural limitation or exclude from the reach of the claims any assembly that happens to be used as original equipment. The specification mentions the use of the crosstubes "as replacements for the old crosstubes," '242 patent, col. 4, ll. 23-25, and it also refers to using the crosstubes to replace prior art crosstubes, *see id.* at col. 4, ll. 25-27 ("The prior art crosstubes that this preferred embodiment is designed to be a replacement for . . . ."); *id.* at col. 1, ll. 54-57 ("It would be beneficial to have a replacement landing gear assembly that would have a substantially longer service life than the prior art landing gear assemblies."). But nothing in the specification or the prosecution history states, or even suggests, that Textron intended to exclude landing assemblies that were struc-

turally identical to its claimed assemblies but were installed as original equipment. *See Grober v. Mako Prods., Inc.*, 686 F.3d 1335, 1342 (Fed. Cir. 2012) (explaining that ambiguous statements made during prosecution "do not disavow or even clearly describe the structure" and that such "reexamination commentary cannot fairly limit the characteristics of the claim term"). Therefore, we reverse the district court's grant of summary judgment in favor of Eurocopter on this ground.

B

Textron next argues that the district court erred in concluding that the accused devices could not infringe the '242 patent because they failed to satisfy the limitation requiring the strap to have a stop surface for mating with the bracket. Textron asserts that nothing in the patent requires the strap to be a unitary structure and that the combination of the rubber gasket and the two stop pieces satisfies that limitation. Alternatively, Textron argues that the combination in the accused devices satisfies that limitation under the doctrine of equivalents.

The district court based its summary judgment of no literal infringement on its conclusion that the accused assembly does not contain a "strap" as required by the claims of the '242 patent. Because the court rejected Textron's argument that the rubber gasket and the two stop pieces in the accused assembly taken together constitute the "strap" that is attached to the cross-piece and mates with the bracket, the court held as a matter of law that the accused assembly did not infringe. Textron argues that if those three components can constitute the strap, as that term is used in the '242 patent, the contested limitations of the claims would be satisfied: The inner surface of the rubber gasket portion of the strap

would engage the crosstube, and the combination of the rubber gasket and the stop pieces would contact and mate with the bracket to minimize the lateral movement of the bracket over the rubber gasket portion of the strap.

We disagree with the district court that, as a matter of law, the three-piece structure in accused assembly—the rubber gasket and the two stop pieces—cannot qualify as the "strap" recited in the asserted claims. In general, "the mere depiction of a structural claim feature as unitary in an embodiment, without more, does not mandate that the structural limitation be unitary." *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1309 (Fed. Cir. 2005), citing *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1367 (Fed. Cir. 2002). Unless the claims, the specification, or the prosecution history require that the particular component be a single, one-piece structure, a court normally will not read that limitation into the claim. *E.g.*, *Utica Enters., Inc. v. Fed. Broach & Mach. Co.*, 109 F. App'x 403, 407-08 (Fed. Cir. 2004).

Nothing in the claims, the specification, or the prosecution history indicates that the recited strap must be a unitary structure. There is therefore no legal bar to treating the combination of the rubber gasket and the two stop pieces in the accused landing gear assembly as the claimed strap. And if those three components constitute the strap, there is ample evidence to show that the bracket engages the strap and that the strap has "an outer surface including a stop surface for mating with the bracket." Because this issue cannot be resolved as a matter of law but presents a factual question, we hold that the district court erred in granting summary judgment of no infringement based on the court's conclusion that the rubber gasket and the two stop pieces in Eurocopter's assembly cannot constitute the claimed "strap."

Eurocopter makes a separate argument that the limitation in the asserted claims that the strap be "imperforate" (with the exception of the fastener holes) means that it cannot consist of more than one piece. Textron responds that the term "imperforate" relates only to the number of holes in the strap, not to whether the strap consists of one piece or more. The district court did not address that issue in its summary judgment order. Because that issue of claim construction was not resolved by the district court, we decline to address it on appeal and leave it to the district court to address in the first instance on remand. *In re Katz Interactive Call Processing Patent Litig.*, 639 F.3d 1303, 1321 (Fed. Cir. 2011); *Metro. Life Ins. Co. v. Bancorp Servs., L.L.C.*, 527 F.3d 1330, 1336 (Fed. Cir. 2008); *Nazomi Commc'ns, Inc. v. ARM Holdings, PLC*, 403 F.3d 1364, 1371 (Fed. Cir. 2005).

Apart from the issue of literal infringement, Textron argues that the district court improperly granted summary judgment on its claim that Eurocopter's accused landing gear assembly infringes under the doctrine of equivalents. We agree with Textron that it has raised a genuine issue of material fact as to infringement under the doctrine of equivalents, and we therefore reverse the district court's ruling on that issue.

Under the doctrine of equivalents, "a product or process that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention." *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 21 (1997); *see Voda v. Cordis Corp.*, 536 F.3d 1311, 1324 (Fed. Cir. 2008). The doctrine seeks to prevent "[u]nimportant and insubstantial substi-

tutes for certain elements" from defeating the patent and destroying the patent's value "by simple acts of copying." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 731 (2002). To prove infringement under the doctrine, the patentee must show that the accused device "performs substantially the same function in substantially the same way to obtain the same result." *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 608 (1950); *see Dawn Equip. Co. v. Ky. Farms, Inc.*, 140 F.3d 1009, 1015 (Fed. Cir. 1998).

The evidence in the summary judgment record was sufficient to preclude summary judgment on the issue of whether the structure used in the accused assembly to prevent lateral movement of the crosstube is equivalent to the strap of the '242 patent. The record in this case demonstrates—and the parties do not appear to dispute—that the accused structure performs substantially the same function as the strap disclosed in the '242 patent: Both serve to limit the lateral movement of the crosstube vis-à-vis the fuselage of the helicopter. It is also undisputed that the accused device produces the same result as the patented invention: Again, both structures limit the lateral movement of the crosstube. The question is whether the accused device achieves that result in substantially the same way as the patented invention. We believe that fact question is one on which a jury could properly find for the plaintiff, and thus summary judgment for the defendants was improper. *See, e.g., Pressure Prods. Med. Supplies, Inc. v. Greatbatch Ltd.*, 599 F.3d 1308, 1318 (Fed. Cir. 2010); *U.S. Philips Corp. v. Iwasaki Elec. Co.*, 505 F.3d 1371, 1380 (Fed. Cir. 2007).

Eurocopter argues that Textron's doctrine of equivalents argument is barred as a matter of law for two reasons. First, it argues that the "all-elements rule"

precludes the application of the doctrine of equivalents. The all-elements rule bars a patentee from asserting "a theory of equivalence [that] would entirely vitiate a particular claim element." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1323 (Fed. Cir. 2009), quoting *Warner-Jenkinson*, 520 U.S. at 39 n.8. Second, Eurocopter argues that prosecution history estoppel bars Textron from asserting a scope of equivalency surrendered during prosecution. *See DePuy Spine*, 567 F.3d at 1323; *see also Festo Corp.*, 535 U.S. at 732.

We reject Eurocopter's contention that Textron's equivalence argument ignores "the limitation that the lateral movement of the bracket that must be minimized is 'on the strap,'" because we conclude that Textron's argument would not entirely vitiate the limitation reciting the structure of the strap. If the rubber gasket/stop piece combination is viewed as being equivalent to the "strap" in the '242 patent, there is nothing to suggest that the lateral movement of the bracket sought to be minimized would not occur "on the strap"; that is, on the rubber gasket/stop piece combination.

We also reject Eurocopter's claim of prosecution history estoppel. Although the '242 patent specification describes the stop surfaces on the strap and how the strap is attached to the crosstube, it says nothing more about the structure of the strap. The prosecution history—including the addition of the "imperforate" limitation—appears to be aimed at avoiding the Fagan prior art reference, which taught having rivet holes at the top of the strap and crosstube. The amendment explains that, unlike Fagan, "the strap fastener holes [are] located only near the neutral bending axis for the crosstube" and that the reason for positioning the holes in that location "is to avoid the problems previously associated with fastener

holes located away from the neutral bending axis [which] resulted in premature crack initiation at those holes." Fagan, in contrast, "shows fastener holes located at the very top of [the strap], this being the location of highest stress." Eurocopter has not pointed to anything other than the term "imperforate" that would suggest that having a strap made of three different pieces was somehow disclaimed by the amendment to overcome the Fagan rejection. Making the strap out of separate pieces (such as a gasket and stop pieces) does not create a need for more holes in the crosstube itself, which is what is disclosed in Fagan.[2] For the foregoing reasons, we reverse the judgment of the district court and remand for further proceedings.

## REVERSED and REMANDED

---

[2] Eurocopter argues that using a bracket that clamps around the crosstube was already known in the prior art, as shown in a patent issued to a Eurocopter affiliate, U.S. Patent No. 5,211,359. Eurocopter asserts that in light of that patent, it would have been obvious to use the stop pieces and gasket attachment mechanism, and that "it would be improper to expand the claims under the doctrine of equivalents to cover this structure." Eurocopter is correct that as a general proposition, the defense of "[e]nsnarement bars a patentee from asserting a scope of equivalency that would encompass, or 'ensnare' the prior art" and that this is "a legal limitation on the doctrine of equivalents to be decided by the court." *DePuy Spine*, 567 F.3d at 1322. The district court, however, never assessed "the prior art introduced by the accused infringer" to determine whether a hypothetical claim that covers the accused device would have been unpatentable under 35 U.S.C. §§ 102 or 103. *See id.* at 1325. As with the claim construction issue, we decline to address that issue for the first time on appeal and leave it to the district court to address on remand.