53 CCPA
### Application of David M. GRIVER.
### Patent Appeal No. 7309.

United States Court of Customs and Patent Appeals.
Jan. 6, 1966.

Smith, J., dissented.

Allen E. Botney, Beverly Hills, Cal., for appellant.

Clarence W. Moore, Washington, D. C. (Jere W. Sears, Washington, D. C., of counsel), for Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH and ALMOND, Judges.

ALMOND, Judge.

David M. Griver appeals from the decision of the Board of Appeals affirming the rejection on prior art of claim 3 in appellant's application [1] entitled "Multi-Terminal Ground Stud." The remaining claims in the application stand withdrawn from consideration as not readable on the elected species, viz. the ground stud of Figs. 1 and 1a, hereinafter reproduced.

Claim 3 reads as follows:

A multi-terminal stud for providing a common reference potential for electronic circuits mounted on a chassis, said stud comprising: an electrically conductive shank member having a smooth-surfaced central aperture therethrough for mounting the stud in an upright position on the chassis, said shank member having a counterbore at one of its ends for firmly mounting thereon the shank member of another stud; and an electrically conductive disc-shaped member at said one end thereof integral with and extending from said shank member, said disc-shaped member having holes therethrough spaced along an equipotential line thereon to provide equal values of resistance between said holes and the chassis, the low potential wires of the circuits being respectively inserted in said holes for connection to the stud thereat thereby to provide a common reference potential for the electronic circuits.

Figs. 1 and 1a of the preferred stud depict the following configurations:

Bored shank 10 is surmounted by outwardly extending flange 11. Holes 14, designed as receptacles for soldered wire connections are equidistantly spaced from the axis of the shank. These terminal holes are "positioned along an equipotential line which is * * * a circle." The lower end of shank 10 bears against the chassis or metal ground support and is secured thereto by inserting a machine screw through bore 12 and an aligned hole in the chassis. Upper counterbore 13 receives the head of the screw or the lower end of a stacked ground stud. The application states that the "stud may be mounted on the chassis by putting a thread on the lower portion of the shank member and screwing it to the chassis."

The references applied below are:

British Patent    783,545 September 25, 1957
Italian Patent    514,965   February 11, 1955

The British patent discloses an electrical feedthrough terminal assembly.

1. Serial No. 776,024, filed November 24, 1958.

Fig. 2 of the drawing is reproduced below:

Fig. 2.

Coupling 18 includes a disc or plate 19 "formed on one side with a small boss 20 having an outside diameter considerably less than the diameter of the disc" 19. The disc and the boss are "centrally apertured and internally threaded for attaching the coupling to the threaded member 12." Disc 19 "is formed around its periphery with a plurality of apertures 21 for receiving the ends of the wires" which are soldered to the disc. In assembling the terminal, the coupling 18 "is screwed onto the threaded member 12" so that the protruding end of member 12 "is level or slightly below the outer face 22 of disc 19 when the boss engages" a washer of the terminal. The resulting depression in disc 19 "is then filled with solder whereby the disc and stem of the terminal become one unit electrically."

The patent states that one or more wires may be removed by the application of heat without disturbing the remainder or adversely affecting the electrical efficiency of the connection. It is further stated that the "coupling provides a simple method of providing separate soldered connections" which are "not affected by vibration and have a lower electrical resistance than a screw or nut connection * * *."

The Italian patent discloses an electrical connection comprising plug and socket portions for telescopic stacking. The base connector may have a threaded extension rather than a plug for bolting through a mounted panel.

The examiner rejected the instant claim as unpatentable over the British patent in view of the Italian patent, finding that the British patent discloses every detail recited in the claim except that the bore of the stud is threaded and no counterbore is shown. The examiner noted that the Italian patent discloses a stud having a bore and a counterbore to receive a like stud therein and would therefore suggest to one skilled in the art provision for a counterbore in the British patent for mounting a stud therein and that it would be obvious to omit the screw threads in the bore if desired. With reference to the arrangement of the holes in the disc of the British patent, the examiner considered the arrangement symmetrical "with respect to both the periphery and the axis of the disc and that this is the obvious way of arranging a plurality of wire-receiving holes in a disc."

In response to applicant's contention that the wire-receiving holes 21 in flange 19 of the British patent are "so haphazardly arranged" as to provide materially different resistances between the holes and the chassis, the board stated that in its opinion the holes:

* * * appear to be arranged in a substantially equipotential line. While some of the holes appear to be larger than others, and assuming arguendo that is in fact the case, we point out that when the wires are inserted therein and the free space is filled with solder, the flange will be a solid conductive member. Therefore, it is not seen how any significant or even a noticeable difference in resistance would be present * * *. As to whether the bore of the shank of the stud is smooth surfaced or threaded is not, in our opinion, of patentable significance since it is a matter of common knowledge that articles of this nature may be supported either by direct threaded connection or by a bolt passing therethrough and through the supporting member and held in place by a nut or nuts.

With reference to the matter of the counterbore, the board agreed with the examiner that the Italian patent would fairly suggest to one of ordinary skill in the art to provide the British coupling with a counterbore to receive another stud in telescoping relation and that the difference in the structure of the coup-

ling in the Italian patent over that of the British patent would in no way affect the efficacy of the suggestion.

The sole issue is obviousness under 35 U.S.C. § 103.

Appellant cites several differences between the claimed subject matter and the prior art. The first is the difference in objectives and purposes of a feed-through terminal, as disclosed by the British patent, and the ground stud, which is the subject matter of claim 3. According to appellant,

> * * * whereas a ground stud is constructed and functions to electrically connect a plurality of circuit points to a point on a metal frame or chassis for the purpose of maintaining these points as much as possible at the same reference potential, a feedthru terminal, on the other hand, is constructed and functions only to permit the flow of electrical current through an otherwise impassable partition or wall without regard to electrical potentials and is necessarily insulated from the wall or partition.

In appellant's view, had the examiner appreciated the difference in concept between the feedthrough terminal and the ground stud, he would have been satisfied as to the novelty of his claimed device. However, this may be, the real issue here is obviousness, not novelty.

Appellant has taken issue with the contention of the examiner that the British device discloses every detail recited in the claim except that the bore of the stud is threaded and no counterbore is shown. Specifically, it is appellant's position that the British device does not disclose a disc-shaped member having holes therethrough which are spaced along an equipotential line. It is true, as appellant forcefully points out, that the specification of the British patent does not expressly state that the holes appearing in the disc-shaped member of the British device are spaced along an equipotential line. However, we believe that Figure 2 of the British patent, reproduced above, does disclose such a *structural*

feature. As the board noted, Figure 2 clearly shows the holes 21 arranged along the circumference of a circle *concentric with the axis* of the multi-terminal stud 18. As we read appellant's own specification, the provision of points of attachment along an equipotential line as called for by the claims is achieved by locating the center of the holes on the circumference of a circle whose center is on the axis of the shank. The specification states:

> Disc-shaped member 11 is concentric with counterbore 13 and has at least two, preferably a plurality of, terminal holes spaced equidistantly from the axis of shank member 10, such as terminal hole 14 by way of example. In view of the symmetry of construction of the ground stud of Figs. 1 and 1a and in view of the further fact that terminal holes 14 are equally distant from the center of member 11, that is, equidistant from the axis of the shank member, terminal holes 14 are therefore positioned along an equipotential line which is, in the present instance, a circle. * * *

Thus, we can see no difference between the *location* of the holes on the disc-member of the British patent and the *location* of the holes on appellant's disc-member. Appellant makes the further point that the holes 21 in the British device are not equidiameter and therefore wires inserted in the larger holes would be off-center because of the extra space and thus would not be positioned on the locus of the equipotential line. We do not accept this argument. We can see no necessary connection between the size of a hole and the ability to locate a wire at the center thereof.

Appellant also contends that the examiner and the board overlooked the fact that differently-sized holes require different amounts of solder and that this will be a source of potential difference which would introduce error. This argument is without merit, we believe, because the disc portion 19 of the British device appears entirely symmetrical with respect to the axis of threaded member

12. Although it appears from Figure 2 of the British patent that holes 21 are of two sizes, there is the same number of each size, and a hole of one size is adjacent a hole of the other size so that the over-all symmetry with respect to the axis of threaded member 12 is maintained. This symmetry is not lost merely because the larger size holes will require more solder than the smaller holes. Moreover, appellant's device requires solder to attach the wires to the stud, and in fact the specification states that the entire stud may be covered with a coating of solder. No reason is apparent to us why solder should adversely affect the operation of a *symmetrical* terminal device such as is disclosed by the British patent and not a symmetrical device such as is claimed by appellant.

With regard to the other features of appellant's claim, namely, the counterbore and the smooth-surfaced central aperture of the shank member, we can find no reversible error in the position of the board as set forth above. Appellant argues that none of the features disclosed in the Italian patent can be physically combined with features disclosed in the British patent to produce a combination of elements that would anticipate the appealed claims. However, the Italian patent does suggest a counterbore and smooth-surfaced central aperture configuration may be used in such electrical connectors. In order to make a valid combination of references, it is not necessary to prove that part of a device shown in one can be physically inserted into the device shown in the other reference.

Finding no reversible error in the decision of the board that the claimed subject matter was obvious within the meaning of 35 U.S.C. § 103, we affirm.

Affirmed.

SMITH, Judge (dissenting).

The issue here seems to me to be whether the *subject matter sought to be patented* is obvious under the conditions stated in 35 U.S.C. § 103. I do not believe the majority opinion decides this issue according to the prescribed statutory tests. Rather, it seems to me the majority opinion is based on the visual similarities between Fig. 1 of the appealed application and Fig. 2 of the British reference patent. Such a comparison seems to me to ignore the requirement of section 103 that the decision as to obviousness must be based on "the subject matter as a whole."

While purporting to decide that the subject matter as a whole *as defined in claim 3* is obvious, the majority opinion ends its analysis when it finds the "disclosed" holes of applicant's Fig. 1 embodiment to be arranged along the circumference of a circle concentric with the axis of the terminals as shown in Fig. 2 of the British patent. At best, this is a "picture comparison test" from which it is concluded that the subject matter of claim 3 is obvious.

However, an examination of the British reference patent fails to disclose the concept of equipotential lines or the manner of position in which the connector holes are located in the terminal body. The specification states only that:

It is a particular object of the invention to provide a terminal assembly having coupling units which will allow several wires to be quickly connected to each end of an electrical terminal. * * *

The majority opinion does not point to any teaching in the British reference from which I am able to find that appellant's invention *of an equipotential ground stud* is obvious. In fact, nothing is said in the British reference regarding the electrical potential characteristics of the Fig. 2 structure or the particular configuration of holes disclosed therein.

The board, in its decision, found that the holes in Fig. 2 "appear to be arranged in a substantially equipotential line." It concluded from this fact that "it is not seen how any significant or even a noticeable difference in resistance would be present as argued by the appellant." Both the board decision and the majority opinion reveal a method of analysis of the prior art reference which I believe improper. Both set out looking for an equipotential line and "find," in a rather

crude figure, something they call a "substantially" equipotential line. The lack of disclosures in the figure is brushed aside with the statement that any differences in resistance would not be "significant" or "noticeable." Thus I do not believe that the reference has been evaluated properly or that appellant's arguments as to the technical differences between the devices have been overcome.[1] I therefore do not find any teaching in the British reference, including the embodiment depicted in Fig. 2 of that reference, which would make the subject matter[2] of appellant's invention obvious. Nor am I convinced that appellant's in-

1. The record contains the following arguments by appellant which I find not refuted:

More specifically, many high-gain circuits, such as amplifiers, have one or more points in those circuits connected to the chassis on which they are mounted. However, in view of the fact that even an excellent conductor has some resistance between points on its surface, be it ever so small, the circuit connections to the chassis inherently have some ohmic resistance existing between them. As a result, current circulating between these points produces small potential differences or voltages between them which are then fed back to the circuits wherein these small voltage unbalances are greatly amplified, thereby oftentimes causing erroneous circuit outputs. It is extremely important, therefore, in the use of these high-gain circuits that their ground (chassis) connections be at exactly the same potential. Appellant's invention is designed to accomplish exactly this result.

The device in British Patent 783,545, on the other hand, cannot produce such a result. * * * the Board stated: "While some of the holes appear to be larger than others, and assuming arguendo that is in fact the case, we point out that when the wires are inserted therein and the free space is filled with solder, the flange will be a solid conductive member. Therefore, it is not seen how any significant or even a noticeable difference in resistance would be present as argued by the Appellant." It is respectfully submitted that this is a fallacious premise.

Differently-sized holes respectively require different amounts of solder. Consequently, since the coefficient of resistance of solder is different than that of the surrounding flange element and, furthermore, since different quantities of solder are involved, slightly different values of resistance will be introduced and this, in turn, will produce the slight voltage unbalances that Appellant is able to avoid with his device. In addition, if the holes are too large for the· wire, as some of them appear to be in the British device, then the wires would not be centered on the equi-potential line and this, too, would cause a slight voltage unbalance.

In other words, with "free space" between the wires and the sides of the holes, some measurable displacement from the equi-potential line will take place in the assembly operation.

* * * * *

With respect to the opinion expressed by the Board of Appeals that the apertures (21) in the British Patent appear to be arranged in a "substantially equipotential line", it is to be pointed out that this is not taught by the British Patent, nor can the spacing of the holes be adequately judged from Figures 1 or 2 therein. It is impossible, therefore, to positively confirm that the holes are, in fact, located along an equipotential locus from the axis of the terminal stem, as is taught by Appellant's device. Accordingly, there is no evidence in the British patent to warrant the conclusion that this feature is an integral part of the British invention. On the contrary, as previously pointed out, the apertures (21) on the British terminal assembly are of unequal diameters, thereby precluding the establishment of true electrical equi-potentiality.

Furthermore, the British device was never intended to be a low-potential or page 1, lines 69–73, that " * * * chassis ground termination, as is indicated by the wording of the British specification which clearly states at the terminal assembly 10 shown therein is intended for an electrical device, such as a transformer, a part of the wall of which is shown at 11. The wall is of any suitable insulating material * * *." This demonstrates that the British device was intended as an electrical "tie-point" for use as a convenience of assembly, what is known as a feed-through terminal.

2. The subject matter of appellant's invention is set forth in his application as follows:

Electrical and electronic circuits generally have one or more points in these circuits connected to some common source of reference or ground potential.

‑

vention would be obvious in considering British in view of the Italian reference. Considering the invention as a whole[3] as *defined in claim 3* (and not solely as the illustrative embodiment shown in Fig. 2 of the application) in view of the references of record, I would, therefore, reverse.

In In re Attwood, 354 F.2d 365, 53 CCPA 365, "we express full agreement with the board's reasons for then reversing" a rejection based on obviousness. Therein it was possible to combine "pic-

> For this purpose, the above-referred to low potential points are customarily connected to the chassis upon which these circuits are mounted at different points thereon. However, in view of the fact that even an excellent conductor has some resistance between points on its surface, be it ever so small, the circuit connections to the chassis inherently have some ohmic resistance existing between them. As a result, current circulating between these points produces small potential differences or voltages between them which prevent the various points in the circuits from being connected to the same reference potential as intended. These differences of potential or, stated differently, this unbalance, may be amplified by the circuits and, therefore, may oftentimes cause erroneous circuit outputs.
>
> Another technique customarily employed in the electronics arts is to mount a lug on the chassis and then connect all the low potential points in the circuits to this lug. However, although the above-mentioned unbalance is reduced, the use of a lug does not resolve the problem of providing a true reference potential. Furthermore, the use of a lug introduces a wiring problem in that each time the solder on the lug is melted to either connect or disconnect a wire, other wires soldered to the lug are also loosened.
>
> It is, therefore, an object of the present invention to provide a multi-terminal stud that provides the same potential at each terminal connection.
>
> It is another object of the present invention to provide a multi-terminal stud wherein electrical currents do not circulate between different terminal connections.
>
> It is a further object of the present invention to provide a multi-terminal stud adapted so that the connection or disconnection of a wire will not affect

tures" from references to argue the invention defined by the appealed claims was obvious. We stated as follows:

> [The Board] could not find either the *inventive concept* or the *result obtained* in the references before it, notwithstanding Raucati had the framing members with holes and Clayton had the knock-outs in the plane of a metal box wall. Knock-outs had then been common practice for a long time yet it was not felt one of ordinary skill in the art would

> the bonds between the stud and other wires that may be connected to it.
>
> The present invention overcomes the above and other disadvantages of prior art reference potential connection devices by providing a stud having an equipotential line thereon to which low potential points in circuits may be connected. Multi-connections to the stud are facilitated by means of orifices spaced along the equipotential line, one circuit connection for each orifice. In particular, the two specific problems mentioned above as being encountered among prior art devices are resolved since, first, the potentials at all connection points vary together and in any identical manner so that a common reference potential is at all times preserved and, second, the connecting or disconnecting of a wire at any orifice does not affect the wire connections at other orifices on the stud.
>
> 3. The term "equipotential line," as used in claim 3, is accepted terminology to describe a characteristic of an electrical circuit. It is not a "line" in the literal sense nor does it refer to any other well known geometric figure although it may in a given instance assume the locus of points described by a geometric figure. By *definition*, an equipotential line is a series of points all of which, in relation to a common point, are equal in electrical potential. When two points are said to be located on an equipotential line, the work necessary to carry a unit positive charge from the one point to the other is zero.
>
> Appellant's invention consists of a multi-terminal stud for providing a common reference potential for electronic circuits mounted on a chassis. The precise way in which the invention achieves a common reference potential for multiple terminals is to *define the location of each terminal along an equipotential line*. This is not made obvious in view of the references of record.

have found it *obvious to use them in structural members* in the manner and for the purpose found in appellant's invention. These reasons for reversing the rejection are, to our minds, the important ones.

And in In re Wesslau, 353 F.2d 238, 53 CCPA 238, we stated:

The ever present question in cases within the ambit of 35 U.S.C. § 103 is whether the subject matter as a whole would have been obvious to one of ordinary skill in the art following the *teachings* of the prior art at the time the invention was made. It is impermissible within the framework of section 103 to pick and choose from any one reference only so much of it as will support a given position, to the exclusion of other parts necessary to the full appreciation of what such reference fairly suggests to one of ordinary skill in the art. * * *

I believe that the majority decision is contrary to the above two cases as well as contrary to the fair teachings of the references of record. The "picture" comparison method of determining patentability was ignored by Judge Holtzoff in Hoerr v. Watson, 156 F.Supp. 182 (D.C.1947). It should be ignored in this appeal also.